

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

**DAVID W. HERCHER**
BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326-1538

COLLIN M. COLE
LAW CLERK

DORIA D. ARNTSEN
JUDICIAL ASSISTANT

March 13, 2018

VIA ECF ONLY                                                                NOT FOR PUBLICATION

Wade P. Bettis, Jr.
Richard J. Parker

Subject:  Michael Scott Campbell
          Case No. 16-34692-dwh13

Counsel:

On June 16, 2017, I held the evidentiary hearing on the Objection to Confirmation of Plan and Motion to Convert or Dismiss,[1] Supplemental Objection to Confirmation of Plan,[2] Second Supplemental Objection to Confirmation of Plan, Motion to Dismiss,[3] and Motion to for Order to Require Debtor to File Amended Means Test[4] (motion to compel) filed by Nancy Campbell (Nancy). I held additional closing argument on July 26, 2017.

I write to explain my decision denying the motion to dismiss and granting in part the motion to compel, which will require further proceedings with respect to plan confirmation. This letter constitutes my findings of fact and conclusions of law.

### I. Synopsis of procedural background

Debtor, Michael Scott Campbell (Scott), and Nancy were married for over 20 years. In 2016, the Union County, Oregon, Circuit Court entered an opinion and judgment dissolving their marriage. A copy of the divorce judgment is attached to Nancy's proof of claim 3-1.

The judgment awarded Scott the marital manufactured home and Nancy an equalizing judgment against him for $68,439. He was ordered to maintain life insurance for her benefit until she was paid in full. He was entitled to contribution from her for half of certain debts. She was entitled to "transitional spousal support" for six months, totaling $3,486 (equal to her half of the debts). But he could satisfy the spousal-support obligation by assuming her debt obligations. The

---

[1] Docket item 14.
[2] Docket item 25.
[3] Docket item 33.
[4] Docket item 43.

court retained the authority to "convert" the transitional spousal support into compensatory support "should [he] deprive [her] of her entitlement under property division."

In the accompanying opinion, the court explained what this meant:

"Any attempt by the court to now convert property division into spousal support merely as an insurance policy against the potential filing of bankruptcy by husband would be to engage an inappropriate speculation . . .. [T]he court retains the authority to convert transitional support to compensatory support should husband engage in shenanigans orchestrated to deprive wife of her entitlement under property division."

In other words, the court reserved the right to transform a dischargeable property settlement into a nondischargeable support obligation in the event of bankruptcy.

The opinion also explained the manner in which the court had valued the home at $150,000. That amount includes only the manufactured home, not the land, which neither Scott nor Nancy owns. Scott's asserted value was $11,894. Testimony at trial revealed that appraisal value did not take into account significant damage to the property.

Scott filed his petition on December 14, 2016.

In Scott's original schedules, he valued the home at $11,895. That's one dollar more than the value he unsuccessfully put before the state court. He listed four vehicles with a combined value of $6,688. He filed an amended Schedule B[5] on January 30, 2017, which added four additional vehicles (three snowmobiles and a motorcycle) valued at a total of $1,950. That amendment was in response to objections from Nancy[6] and the trustee.[7]

While Nancy's confirmation objection and motion to dismiss were pending, she obtained relief from the automatic stay to return to state court.[8] The stay-relief order permitted her to "have contempt hearing conducted and liquidate amounts due for spousal support," and it permitted the state court to determine the amount of any spousal support still due to her, the amount of attorney fees to be awarded for collection and contempt matters up to the date of the bankruptcy filing, and whether Scott was in compliance with the judgment's requirement to maintain life-insurance coverage. The order prohibited her from enforcing any money awards or judgment without further order of this court.

The state court entered an Opinion and Order on February 22, 2017; a copy is attached to her proof of claim. That order held Scott in contempt for violating the state court's judgment, based upon "his threats [i.e., his threats to multiply Nancy's costs by appealing and filing bankruptcy], intimidation, and ultimately the filing of the Chapter 13 bankruptcy with one purpose in mind—to leave [Nancy] nothing for her contribution throughout the marriage." The

---

[5] Amended Schedule A/B [19].
[6] Objection to Confirmation of Plan and Motion to Convert or Dismiss [14].
[7] Trustee's Objection to Confirmation of Plan and Motion to Dismiss [15].
[8] Order re: Relief from Stay [28].

order imposed on him "fines" of $585.24 per day beginning 45 days from entry of the order. He could purge his contempt by, among other things, paying the entire equalizing judgment of $68,439.

II.   Analysis

   A.   *Jurisdiction*

This court has jurisdiction over these matters under 28 U.S.C. §§ 1334 and 157. These matters are core proceedings under 28 U.S.C. § 157(b)(2)(A) and (J). Neither party disputes this court's constitutional authority to enter final orders on these matters.

   B.   *Motion to dismiss for bad faith*

The Ninth Circuit's 1999 decision in *In re Leavitt* lists five factors that a bankruptcy court should consider in determining whether a chapter 13 case should be dismissed for bad faith: (1) any misrepresentation of facts in the petition or any plan, (2) any unfair manipulation of the Bankruptcy Code or filing the petition or plan "in an inequitable manner," (3) any history of prior petition filings and case dismissals; (4) whether the debtor intended only to defeat state-court litigation; and (5) whether "egregious behavior" is present.[9]

      1.   **Misrepresentations**

Nancy makes numerous allegations of misrepresentations by Scott,[10] which can be condensed to two: (1) he concealed and undervalued his assets by failing to disclose vehicles, understating the value of the home, and using cash withdrawals to conceal liquid assets and (2) he understated his income and overstated his expenses by including unnecessary expenses and overstating budget items, incurring needless expenses, and increasing his voluntary retirement contribution and mischaracterizing it as mandatory.

         (a)   *Home value*

Evidence of the value of the home was presented with respect to Nancy's allegation that Scott had undervalued it. The evidence included the testimony of David Mead and Leo S. Bristol, Jr., offered by Nancy, and Aaron Still and Scott himself, offered by Scott.

Scott testified that, when the home was installed in 1996, the installer didn't properly install roof flashing under the roof, and the first time it rained, the inside wall was soaked with water. The seller repaired the flashing, but didn't replace the wet interior members of the home or the wet sheetrock walls. That wall is now soft and discolored. The shingles are now 20 years old and starting to leak again, and Scott has had to put a tarp on the roof to keep water out.

To obtain information about the home's value, Scott consulted a dealership, which referred him to the NAIA computer website. Scott input information into that website, which

---

[9] 171 F.3d 1219, 1225 (9th Cir. 1999).
[10] Creditor trial memo. at 1-2.

generated a value of $18,000, a cost to move of $7,000, resulting in a net value such as for a sale through a dealership of $11,000, which is approximately the amount Scott listed for the home's value in his schedules.

Mead, although an appraiser, said his report "absolutely is not" an appraisal, but instead it's a "drive-by." He opined on direct examination that the value of the manufactured home with the land it sits on was $214,000, and he would make a value deduction for loss of the land of $117,000 (Scott doesn't own the land), leaving a value for the home itself of $97,000. He assumed that the home was in average condition and did not consider the home's actual condition. Bristol, a roofing contractor, opined that replacement of the home's roof would cost $7,650, which includes a $650 dump fee. The net Mead value, less the Bristol gross roof-repair cost, would be $89,350.

On cross-examination, Mead said that he had "no clue" that the home needs a new roof; had he seen the tarp when he drove by, he "would have had a fit" because a drive-by valuation assumes structural integrity.[11] He also wasn't told that the home couldn't be sold in place and would have to be removed from the property if Scott ceased to live there, due to the terms of the conditional-use permit for the home.[12] When asked to consider negative factors such as the condition of the home's roof, prior water damage in the home's walls, and the cost to move and repair the home, Mead said that the home "probably has no value once you consider that you have to take it off the property."[13] Later, he said "I don't think that manufactured home, based on what you told me, is worth a damn thing."[14]

Still, also an appraiser although he did not formally appraise the home, opined that it had "minimal" value. According to him, it is difficult to finance a manufactured home that will have to be moved to a new site. The move will impose the costs of trucking and setup on a new site. Because financing would be difficult, the market would be limited to cash buyers. He valued the home as personal property based on the comparison of amounts for which others have been sold and moved to another location. He obtained that information from the tax assessor's records. He assumed that the home has the following negative conditions: dry rot, leaking roof, inside damage, and a kitchen that might need to be torn up and repaired. To value a home requiring repairs to make it suitable and habitable, he would obtain a contractor's estimate of the cost to repair and deduct that amount from the value of the home as repaired, which would then be in average condition. He concluded that the home's owner would probably receive a few offers to move the home for free, i.e., for payment of nothing to Scott as owner.

I find that Scott's scheduling of the home's value as $11,895 was made in good faith and is correct.

---

[11] Mead testimony 2:09 p.m.
[12] Mead testimony 2:16 p.m.
[13] Mead testimony 2:24 p.m.
[14] Mead testimony 2:28 p.m.

### (b) Scott's failure to disclose vehicles

Nancy asserts that Scott failed to schedule disclose snowmobiles, a motorcycle, and an all-terrain vehicle.[15]

I accept Scott's testimony that he omitted some items because he, or he and Nancy together, had bought them as presents for and given them to their sons and thus are not his property.[16] As to a four-wheeler that he omitted, he credibly testified that he simply overlooked it when preparing his schedules and that it has nominal value, having cost $400 when purchased and now having been driven 8,000 miles.[17]

### (c) Scott's increase in his retirement contribution

Nancy asserts that Scott acted in bad faith when he more than tripled his voluntary retirement contribution at about the time of the petition filing.[18]

Scott testified that he relied on an "investment advisor" website in adjusting his retirement contribution. Before filing, he had increased his contribution from 9 percent to 20 percent, but afterward he reduced it back to 9 percent.[19]

Reasonable steps taken by a debtor to adjust planning for retirement and to take advantage of bankruptcy exemptions do not support a bad-faith determination. Under these circumstances, I find that Scott did not act in bad faith in adjusting his retirement contribution.

### (d) Additional issues raised in testimony

Scott explained the increase in his wages above his scheduled wage amount as having resulted from a higher-paying shift and more overtime.

Among the prepetition expenditures challenged by Nancy were one for $6,000, which Scott explained as his payment to help his mother after his mother was the victim of a scam that cost her that amount.

Scott testified credibly that he did not remember an unscheduled $2,000 debt owed to him by Jessica Collins.

I am satisfied that Scott's allowing his son to live with him is not evidence of bad faith, although the son does not contribute very much to payment of household expenses and is employed "most of the time."

---

[15] Creditor Trial Memorandum [59] (Creditor trial memo.) at 3:10-11.
[16] See, e.g., Scott testimony at 9:51 a.m. (Yamaha was gift to son).
[17] Scott testimony 9:49 a.m.
[18] Creditor trial memo. at 3:21-22.
[19] Scott testimony 11:55 a.m.

Nancy challenged the reasonableness of several individual items in Scott's budget, including $1,200 per year for clothing, $75 per month for personal-care products and services, and $100 per month for entertainment. Scott's testimony is not inconsistent with those amounts being actual or reasonable, and Nancy did not offer persuasive evidence to the contrary.

### 2. History of filings and dismissals

This case is Scott's only filing, according to our records. The history-of-filings factor does not weigh in favor of bad-faith determination.

### 3. Intent to defeat state-court litigation

Although Nancy's judgment is probably the primary factor motivating Scott's filing, he did not file his bankruptcy petition during the divorce, so he did not file bankruptcy with an intent to "defeat" the divorce litigation, at least in the sense of staying its resolution in state court. Also, although he probably intended to try to discharge the equalizing judgment by successfully completing chapter 13, but chapter 13 debtors are within their rights to try to discharge debts that are dischargeable in chapter 13. The "intent to defeat state court litigation" factor does not weigh in favor of a bad-faith determination.

### 4. "Egregious behavior"

I find no facts constituting egregious behavior by Scott.

### 5. Bad faith generally

I conclude that the nondischargeability of Nancy's equalizing judgment in chapter 7 does not establish Scott's bad faith for selecting chapter 13, where that debt would be discharged if he completes a chapter 13 plan.[20] I decline to follow the unpublished Oregon case that Nancy mentions, *In re D'Agnese*,[21] which in any case is distinguishable because there, before the petition date, the debtor violated provisions of the equalizing judgment requiring that he grant his ex-spouse a security interest in the marital business assets awarded to him and the he pay her from sale of the business. The chapter 13 discharge is broader than the chapter 7 discharge, and its breadth is an incentive for debtors to confirm and complete a chapter 13 plan.[22] It is not bad faith for a debtor to choose the chapter that accords him the greatest benefit, as long as he complies with the requirements of that chapter.

### C. *Confirmation*

Nancy's grounds for confirmation objection appear to include all the facts on which she also relies in support of her motion to dismiss. To the extent that she alleges that Scott acted in

---

[20] *But see, e.g., In re Estus*, 695 F.2d 311, 316 (8th Cir. 1982).
[21] No. 15-61167-fra13, 2015 WL 9981840 (Bankr. D. Or. Dec. 15, 2015).
[22] *In re Rimgale*, 669 F.2d 426, 428 (7th Cir. 1982).

bad faith as a ground for objection as well as for dismissal, I reject that allegation for the reasons set forth in part II.B above.

I also reject Nancy's confirmation objections to Scott's valuation of the home at $11,895, exclusion of certain vehicles that Scott testified were given to their sons, and the other allegations in part II.B above, except with respect to the unscheduled four-wheeler and to the extent that I have granted the motion to compel in part II.D below.

Having found that Scott neither filed nor is prosecuting this case in bad faith, I also decline Nancy's invitation to require that any plan pay her 100 percent of her claim. In any case, bad faith is a ground for dismissal or conversion, but there is no statutory basis for the court to imposing a minimum plan payment in lieu of dismissing or converting a bad-faith case.

### D. *Amendment of means test*

Nancy's motion to compel Scott to amend his means-test form[23] is nominally a discovery motion, but I treat it as another challenge to the income and expense figures that are considered in setting the required plan payment and any best-interest number.

Nancy alleges that Scott has made three errors requiring amendment of the means-test form: (1) he has not accounted for the income of his son, who lives with Scott, as part of household income; (2) he incorrectly referred to his voluntary retirement deduction as a mandatory deduction; and (3) he included provisions for payment on a "co-signed" car, even though he has proposed to surrender the car and has not been making payments on it.

#### 1. **Son's income as part or household income**

Based on Scott's testimony, I find that his son's income is so variable and small that it would not be feasible to determine an amount by which to augment the assumed household income. And Nancy has not challenged his position that the son is in fact a dependent. I will deny the motion to compel with respect to the son's income.

#### 2. **Voluntariness of retirement contribution**

Nancy challenges line 17 of the means-test form, which includes the figure $584.74 as an involuntary payroll deduction. Scott testified that the payment is in fact voluntary.

I agree with Nancy that the amount should deleted from that line, so I will grant the motion to compel in that respect.

#### 3. **Cosigned pickup loan**

Nancy challenges line 33d of the means-test form, which includes a secured-creditor payment of $210.03 to Rogue Credit Union on account of a 2005 Ford F-250 pickup. The plan

---

[23] Chapter13 Calculation of Your Disposable Income [4] (means-test form).

provides in part 3(b)(5) that the pickup will be surrendered to Austin Insko, and the plan makes no provision for payment to the credit union.

I agree with Nancy that the $210.03 payment should be deleted from line 33d, so I will grant the motion to compel in that respect.

### III. Conclusion

Scott's actions in preparing and filing his petition do not rise to the level of bad faith warranting conversion or dismissal of this case. To the extent he has made errors, I attribute them to his lack of familiarity with bankruptcy process, rather than ill-will. I will deny the motion to dismiss.

In response to Nancy's motion to compel amendment of the means-test form, I have made rulings in parts II.D.2 and 3 above that could affect the required plan payment or the best-interest number. Also, Scott will need to amend his Schedule A/B to include the omitted four-wheeler. I will schedule an adjourned confirmation hearing, at which I will consider suggestions on behalf of the parties—and in particular the trustee—on how those rulings affect the required plan payment or best-interest number.

Except to the extent that my decisions above are inconsistent with the trustee's separate pending confirmation objection, this decision is without prejudice to the trustee's objection.

Sincerely,

*David W. Hercher*

DAVID W. HERCHER
Bankruptcy Judge.